Case number 23-1523, Shannon Blick v. Ann Arbor MI Public School District, et al. Oral argument not to exceed 15 minutes per side. William Tishkoff for the appellant. You may proceed. And just to confirm, I'm going to be asking for 8 minutes on the main argument and 7 minutes for rebuttal. 7 minutes for rebuttal? That's splitting your argument basically in half. Did you ask for that in advance? I was going to try to split it in half so I could answer any questions the panel has, but I'm certainly fine doing 10 and 5. But why don't I do 10 and 5? It's up to you since my co-panelists have questions. I normally do 10 and 5 and I'm going to have, let me do that. You may have questions on the direct presentation. I assure you that if we have questions, we will give you the time to answer all of them. Much appreciated, Your Honor. All right. It's a pleasure and honor to be here before you today. We have quite a significant case that was pending in federal court here. My client, Shannon Blick, and I know you've read the briefs here, was a very prominent principal at Lawton Middle School in Ann Arbor, Michigan. And the main events started in 2009. Wait, is Lawton a middle school? I thought it was an elementary. I'm sorry, elementary. Now she had three children that were attending that middle school and everybody did know about that. When we get into 2019, and she was a very popular principal at the school, the person for the union, Mike Madison, who's a representative, first tells her that you basically are in trouble. And at the same time there's rumors going on. In fact, there was an investigation of Willie Johnson for allegedly stealing money on the lunch break. My client later, there was a report to the police by Ms. Linden and the school, and she was never charged, was not found guilty of that. The main thing is the issue of this rumor of sexual misconduct, which is just outrageous, between a married woman and her maintenance man while she's working at school. Now, there was a movement, as documented in the exhibits in the brief, to have her resign. Now, the investigation got going on Willie Johnson. There was a movement to have my client resign, and she refused to do that. This resulted in April 26, the placement of my client on an indeterminate administrative leave. Mr. Tischoff, if I could interrupt you for a moment. Absolutely, Your Honor. I think one of the more interesting and arguably difficult aspects of this case is that while you make this free speech argument, it's not clear, at least from my read of the record, that we know even what she intended to say, that she claims that she was prohibited from saying by virtue of the letter that she got. Understood, Your Honor. And I'd like to address that. This was such a big issue. There was newspaper articles that covered it and talked about the mysterious suspension of my client. And there were already rumors about the sexual misconduct going over. And, Your Honor, those rumors were put in the public. She wanted to address it at the board meeting. There was a clear movement by the superintendent and Lyndon Langford to stop her from testifying at that hearing. Not testifying, but speaking at that hearing. Did she testify at any point that she wanted to attend the board meeting and disclaim these allegations of an affair? I believe that she clearly indicated that she wanted to attend the meeting. I thought the record showed that there were a number of parents that presumably were friends of hers that wanted to show up. That's right. She concluded that that was probably not a good idea and encouraged them not to show up, as opposed to she wanted to show up and defend herself or make a statement or whatever she wanted. Your Honor, there were actually these parents that were going to attend the board meeting, and the newspaper article about the mysterious suspension of her, which lasted for over two years, was to be addressed at that board meeting. The supervisor and Lyndon and Langford knew that she was planning to go. They knew these parents were planning to go, and it was at this meeting the day before the board meeting that they brought her in and accused her and told her they had this evidence of sexual misconduct by her and Willie Johnson. They took their file and they pointed to it. They didn't show what was in it. She completely broke down, and she was crying. It was at this meeting that they handed her the names of the people they didn't want to. What is there? Can you point to us to something specific, like a pin site in the record, where it says that she wanted to speak herself at this meeting? I think the record makes clear that parents wanted to speak, and nothing would have prohibited the parents from speaking. But what in the record suggests that she wanted to speak about the investigation and decided not to because they threatened to disclose these allegations? Your Honor, I do not have a pin site for you. Assume I couldn't find anything. This is an unusual case because you do have, in the suspension letter, you do have a pretty substantial note talking about the investigation requirements, so it's a prior restraint. But if we have no evidence that she actually wanted to talk about the investigation, I don't know if it's a standing question or what the type of right analogy is, but it just suggests she hasn't been harmed by the speech restriction if there is no evidence that she wanted to or would have spoken. I believe the record is pretty extensive that she did indicate and they knew she wanted to go to the meeting. It's so extensive. Well, I don't have a pin site. I mean, I completely agree with you that the record is extensive that the parents wanted to speak, for sure. But I don't know that there was anything. I mean, she doesn't even have third-party standing to assert the parents' rights. The question here is, did the speech restriction violate her own rights to speak? And I just don't see any evidence that she wanted to speak. We cited the San Diego Supreme Court case that says there is an interest at stake by the public which is just as strong in terms of receiving the information as it is in the right of the employee to disseminate it. How does that answer the question about whether there's anything in the record that even supports the fact that she wanted to go to the meeting? Particularly in light of if you look at the letter that placed her on leave, it says you're directed not to contact any students. That's not at issue here. Parents, that may be at issue, but she contacted them not to speak, or staff regarding this matter. It doesn't say, for example, that she couldn't go to a board meeting that was discussing her fate? Well, that in context with the meeting on the 7th, where they indicated to her, if you go to the meeting, there's going to be somebody from MLive there, and they're going to FOIA your personal file. And this information is going to come out about the sexual investigation they'd done with this janitor or maintenance man. That is extremely restrictive on an ability of a woman to go to the board meeting and talk. Doesn't she want to go talk about these allegations? I don't understand how you can say she's worried about the publicity that will happen if you show up at this meeting. It will be disclosed that you are having, or that there's an allegation that you're having an affair with a janitor. The thing that you want to speak about is I'm not having an affair with a janitor. She wanted to address the allegations and the public outcry as to the mysterious disappearance of the principal, and she was not allowed to go to the meeting. Don't we have two questions here? One is the question of whether she committed some sort of fraud in helping this guy get paid for work that he didn't do. That's one thing. And then as that's unfolding, this question comes up. If you show up at the meeting, they're going to hear what's going on, and they're going to ask for your record, and it's also going to show this allegation, true or untrue, about your having some sort of relationship with this guy. She makes the decision. She doesn't want that to happen, so she doesn't go to the meeting. She doesn't speak. I'm trying to figure out where there's that. In that context, there's a violation here. And, Your Honor, I do not believe it was her decision. I mean, that's the point. They made this allegation, got her to break down, gave her the names of the people to call, and told her to call. The matter at issue— Was it in the file? Had she gone to the meeting and MLives asked for a copy of the file? Were these allegations in the file? The newspaper was covering this letter that said that she was on leave and respect to privacy, which is not something she asked. They said she asked that. And the rumor going around, which is indicated in the media coverage, was there was some question about sex with this janitor. They stopped her from going to the meeting. The case law that we cited says there's a very strong public interest in matters of school affairs, as cited by the original judge in this case. There was an interest in this prominent figure who was suddenly suspended and disappeared from public school and wanted to know what was impacting children. What prohibited her from going to the meeting, aside from, and we'll call it a threat, aside from the school administrator's threat, to this is what will come out in the public record if you do this? We thought that she could have said, well, that's fine, it's not true, I want to speak to it, and gone to the meeting, couldn't she? I do think in this case that type of conduct raises to the level of a restraint, Your Honor. I do think in this case that does. She had been broken down, and while she's broken down, she's crying, she's been confronted with this alleged evidence of the sex, and clearly indicated she wanted to go to the meeting. So stop right there. She was shown the evidence of this alleged sexual relationship? She was brought in by the HR person, Langford, I believe Lyndon was there as well, and they said to her, we have done this investigation, and we have this evidence here about the sexual conduct. There isn't a question that they lied or they made it up. It may not have been true, but at least at that point, is it fair to say they believed that there was something to that allegation? It turned out there wasn't evidence. I know what turned out, but we're talking about this, what you described as this seminal meeting before the school board met, where they say, if you come, which implies that they weren't prohibiting her from coming, if you come, if you talk about this, this is what's going to come out. Do you want that to happen? Why is that unreasonable? It wasn't true that there was any evidence found of the sex. They went to the police four days after she... Did the school administrators at the time they had this, what you're calling a prior restraint meeting, know that it was untrue? Oh, yeah, absolutely. They knew that there was not evidence in the file that they found about this alleged sexual conduct going on. She files her complaint. You just said a minute ago they pointed to her to the evidence that was in the file. It can't be both. No, Your Honor, they pointed to what they said was her file. They said they'd done the investigation. They did not show her the documents. But they said that they had it, which, Your Honor, was not correct. And what happens here is she's not allowed to go to the meeting. She is caused not to want to go. Anyone, I think, would think there's an issue of fact for the jury as to if this happens to them, whether they would actually go. She's given the names of these teachers to call to stop them from going. And there is a right for the public to know what's going on as well as her right to just disseminate it. Just to disseminate it. Now, after that, she refuses to resign. And she files her complaint on July 20. Four days later, they go to the police. And we've quoted it, the exact section in here. They're told that she's engaged. They have evidence that she's engaged in fraudulent activity. And they're told that it involves sex with Johnson, which is not true. And no evidence ever came out actually establishing that. She was never charged or convicted of that. Now, she's put on administrative leave for two years. Can I ask you about that? So the amended complaint was filed, I think, six months after her initial suspension. And you never filed a supplemental complaint? There's one amended complaint. My understanding of the record is correct. It was filed in October of 2019, which was well before her non-renewal of her contract or the two months of pay that she did not initially receive. I think that when you have new facts that develop after a complaint has been filed, it's the duty of the plaintiff to file a supplemental complaint to add these additional allegations. And if you don't, I don't think we can consider the new information that happens after the complaint. So it seems to me that all that we have in front of us right now is the six-month period between April and October when you filed your amended complaint. Respectfully, I would disagree. Procedurally, Your Honor, and I don't mean to second-guess, but the standard for granting summary judgment or whether the allegations are sufficient is whether it could reasonably occur in the future. It doesn't have to be filed about your allegations about what the facts will show and what the cause is. Isn't one of your claims, for instance, on the first amendment retaliation was the non-renewal of her principal contract that happened two years later? We allege that she was constructively discharged. Yeah, but aside from that, when she was actually effectively discharged, at least from her principal position. So are you conceding that we shouldn't consider the formal discharge and we should only consider the allegations of constructive discharge? Your Honor, we allege that it was constructive discharge. She sat at home for two years without any assignment. I do believe you can present evidence up to trial about what is developed before trial. You say she was constructively discharged. She was being paid during this period, wasn't she? She was suspended without pay. But her duties were taken away. And the case law says, that we believe is cited here, there is a period where you can suspend somebody for an investigation, but not for two years. And if I could just highlight, there is this investigation report, which is turned in on July 23rd, right before the police report by their attorneys. And allegedly it contains information which shows various things that would justify the police report. That investigation was done. There's no evidence there was any other investigation. And yet, the basis for continuing the administrative leave for six months after that and throughout, was that there was an ongoing investigation. The reason that she didn't get a right to sue, which she asked for and was told you're going to get, was that there was an investigation going on. That was false as a matter of fact. These are clearly issues for the jury to consider if this kind of conduct did in fact take place. Freedom of association, freedom of expression. For association, absolutely, she has a right to go for her children and attend to them. They have cited that they have a policy of putting somebody on administrative leave. They did it for two years. I never found a case anywhere in the United States that that was considered not constructive discharge. They say they have a policy. You can't communicate with anybody. She's a parent. We asked them about it. There's no exception for that. She's told you can't go to. But the district court said you can't communicate with anybody about the investigation. Not you can't communicate with any Lawton parent. We know she communicated with Lawton parents. There was, we cited the affidavit of Ms. Cook who was there and said there was question about what about personal things. And the answer was you cannot communicate. They even suggested if you see her in the store, whatever, you shouldn't communicate. Now, her friends were asking how can that be when she is a parent? And she was shut down from attending parental functions after this all took place, including having The letter says there's a specific exception for matters that involve your children. And she participated, according to the letter. I'm sorry, just so I can understand, which are you referring to? The letter of April 26. Oh. That triggers all of this. No, no, I do understand that. But the policy Your allegation is that she was prohibited from any interaction with her children at all. The record seems to demonstrate that she did in fact attend events relating to her children during that period. The only thing she couldn't do is she couldn't see them on a day-in, day-out basis, which she was able to do as the principal, not in her capacity really as the parent. I would disagree on the facts, Your Honor. It was not a day-in, day-out. She couldn't come on the premises. She wasn't allowed to deliver medication to her son. She wasn't allowed to attend her daughter's singing at a school event. She wasn't allowed to attend her son also in a singing event at the school. Now, on a day-to-day basis, she could not go into the school. One of those singing events, no parents were able to attend because they weren't parents of somebody in the graduating class, so she wasn't treated any differently than any other parent was on at least one of those events you're citing. That's what makes this case difficult to parse allegations versus what the record supports. Well, Your Honor, I think these are issues of fact as to all these things that were done to her. I do think there was not any written policy that you have to have a specific children. It was planned that she had a son there. The other event specifically was, and this was a range of harassment that happened to her kids. We have the affidavits about her kids repeatedly breaking down from the harassment that took place at the school. The freedom of association for a parent is considered to be a very high and important standard. These were personal relationships she had with her kids. Okay. I see your red light is on. It's been on for a while. Do you have further questions? We will still hear from you on rebuttal. Okay. Thank you very much. Good morning, Your Honors. May it please the Court, I'm Marie Veracruzzi-Welch on behalf of the appellee's defendants in this case. Your Honor, it's clear you've read the record. I want to clear up a couple points that were made by my opposing counsel. The article in the paper didn't come out until June 20th, I believe, which is more than a month, more than a month and a half after this May 8th board meeting. The sites in the record where she says she was not intending to speak at that meeting, she was not ordered not to go to that meeting, and she was not ordered to talk to parents, were 115 to 116, 147, 160, and 165. To go a step further, I believe it's on page 277 of her deposition, she says she asked permission to reach out to those parents and talk to them. How does this interrelate? So we have, setting aside the allegations that are not involving the investigation, assume we agree with you that the letter told her she couldn't talk about the investigation. That's still a pretty broad speech prohibition. Jackson, I think the case is called Jackson, from 1999, was at the pleading stage, but suggested that a broad, what they call a gag order of an investigation of a chief of police could raise First Amendment issues. But how does this speech prohibition interrelate with the idea she didn't want to speak about it anyways? How does the fact that maybe she didn't want to speak about it anyways go into the challenge? I just don't understand the framework. So I understand pickering balancing and the steps, but if there's no evidence of any intent to speak, can we essentially avoid all of that and just say she almost doesn't have standing? I don't know if it's standing because she has a concrete injury. But I'm just confused about how that lack of evidence on that point plays into the constitutional analysis. I think you're exactly right on that, is that she didn't intend to speak. There's no evidence that she was intending to speak anyways. And we don't know what she would have said had she wanted to speak. Is that also relevant, what she would have said? I think what she would have said is relevant. Or what she wanted to speak to maybe more generally, I guess. The point of the speech, and that comes across in plenty of cases. With respect to your question about even if it is relevant, this alleged broad brush restriction, in the Farhack case, the janitor in that case was prohibited from speaking to teachers or staff about anything whatsoever. And the court said that was fine. It's a much shorter investigation. I'm wondering, one thing I think that works against you here is this was a two-year investigation with a really broad speech restriction. And I think your answer to that is, well, the investigation took as long as it took, and generally there's no time limit on investigations. And that's true in the criminal context, aside from statute of limitations. But at that point, there's no liberty restriction going on while the police are investigating crime. But there's arguably a liberty restriction going on here because she's got an impairment of her speech. So can you speak to the two-year investigation and how that factors into Pickering balancing? Because it does seem like an awfully long time. Sure. So first of all, let me explain the process of the investigation just so you understand it. In this case, there's concerns that are raised about the misappropriation of public funds. Then there are additional concerns that are raised that it may be related to favoritism provided to Willie Johnson by Ms. Blick. The district does an investigation, and then the district says, and this is really similar to the Sunsabot case, the district says, you know, we want to be really sure before we decide what steps we want to take. So they go to a law firm and say, you know, can you take a look at this, do an investigation yourself, and make sure that we are correct on this. The law firm does an investigation and says, we think that there is right to file criminal charges on this. We think that there's been misappropriation of public funds. We also think that there's fraud alleged. Could you stop right there for just a second? Of that two-year period, how much was taken up by what you've just told us? So that goes up until the July 24th timeframe. So that is from approximately, you know, April to July. Why did we say the investigation ended there? Because then you referred it to the police. Referred it to the police, and then the police, who has greater subpoena power, did a deeper dive into this, did their own investigation. Remember, during this time period, COVID happened. So police do an investigation. It takes them longer than usual as a result of COVID. And at the end of the police part of the investigation, the police say, we think there's reason to file charges against Ms. Blick. It was a prosecutor that ultimately ended up not filing charges. But at that point, the district, at that point, Willie Johnson was being prosecuted. And we didn't know, you know, was Willie Johnson going to flip his testimony at that point and implicate Ms. Blick? And in any event, she's on, you know, paid leave and benefits. You know, we want to be sure that we're not going to put someone back into the district that's ultimately going to be charged with the crime. So you're saying they were waiting to see the outcome of the prosecution of the janitor? That's correct. And how long did that take? That part, I believe, only took a matter of months. It wasn't very long in the grand scheme of things. It was the investigation on the police's part that took a long time. So the district court, at least at the motion to dismiss stage, and then I think at some portions at the summary judgment stage, said that a suspension with pay does not qualify as a, whatever, adverse action. But most of those cases were just like a five-day suspension. I am somewhat troubled by the notion, if we say that this was not an adverse action, what that means is you could have separate policies for one race and another race. You can have a policy of when we're investigating white people, we're going to suspend them with pay, but when we're investigating African Americans, we're going to let them keep their job, or excuse me, keep their duties. And under the view that a suspension with pay does not qualify as an adverse employment action, that facial discrimination would not be cognizable under the Equal Protection Clause or Title VII or the state law. That does seem somewhat problematic to me. Well, I do want to bring up that point, and that was actually the first thing I wanted to talk about here. What we raised before Judge Dawkins-Davis is the fact that she couldn't point to anything like that. In fact, Judge Dawkins-Davis directly asked opposing counsel at the hearing, is there an allegation that someone else similarly situated was treated more favorably than she was? And opposing counsel apologized and said, sorry, Your Honor, there isn't. But what we think is... So there's different ways a discrimination claim can, in the end, fail. One of them is that there was no discrimination. Another one is that even if there was discrimination, there wasn't an adverse action. That strikes me as different grounds for decision than the decision on which the district court relied. So I want to go a step further, though, is that in this case, the plaintiff's counsel went a step further and said, listen, Your Honor, here's what I think might happen, is that I think in discovery... Now, we don't have anything that says that Tania Giles didn't sign time cards. But I think in discovery, there may be something that shows she signed time cards and there may be something that shows she didn't sign time cards. Well, if we're going to allow cases to proceed on the hope that in discovery plaintiffs may be able to establish a case, that's going to fly in the face of years of precedence. And I'll point to the City of Cleveland case that says a plaintiff is required to provide factual grounds for relief at the motion to dismiss stage, not just conclusions. And that's 502 F. 3rd 548. Next, I want to talk about... Before you go on to something else, I want to take you back to one of the claims that Mr. Tishoff is making, and that is they basically induced her by not to show up at this school board meeting and to encourage other parents not to show up by, I think he said, pointing at a file and saying the file had evidence in it for which there was no evidence. In other words, they bluffed her, they lied to her. What is your response to that? Well, first of all, that's just simply not the case. During the investigatory meeting on May 7, they asked her, they said... You know, they had spoken with Mike Johnson. Mike Johnson was really... Excuse me, they had spoken with Mike Williams. He was the supervisor of Willie Johnson from the contract house. And Mike Williams told the district that Willie Johnson told them that he was engaging in a relationship with Ms. Blick. And then there was... That information was recorded in this file? Yes, it's in the file. I can point to the page site. It's a May 7 notes in the file. And so if... If the... If she had gone... If Ms. Blick had gone to the meeting, an MLive reporter is going to be there. It is not... And the MLive reporter had subpoenaed... Or not subpoenaed, filed a FOIA request for the personnel file. The MLive reporter would, in fact, have uncovered these May 7 notes that say, somebody at Mr. Johnson's employer said that Mr. Johnson told him that there was a relationship. No, absolutely not. Oh, wait, that's a no? That was in their investigatory file. Correct, but the personnel file that is going to be FOIAed, there's a clear policy in the Ann Arbor Public Schools that she's charged with knowing as the principal because she's supposed to be enforcing those policies, is that investigatory files are not part of personnel files. What's the quoted part of the allegation is that they said MLive may subpoena her personnel file. That's it. So you're saying this wasn't in the personnel file? No, couldn't be. Well, the allegation is that they were pointing at the personnel file and said it was in the personnel file. Is there any support for that? What... If you read the testimony, what is actually said is that... And we've got the affidavit of Jason Skibba, her union rep that's there, and the testimony of the other two people there. Remember, Ms. Blick says, I was so upset, I don't really remember what happened in this meeting. The only quoted part that she says, again, is about this personnel file issue. At best, the testimony shakes out to be, we talked to Ms. Blick, we told her that there's this group of parents that are coming, and she was upset about the allegations that she was asked about, and said, you know, because M-Live is going to be there, this investigation, the fact that this investigation is occurring, all of that may become more public before we're able to complete the investigation. We just want to make you aware of that. You can choose to talk to these people or not. But at the end of the day, if the court were to find that that's a prior restraint, and I don't think that it should, it next turns to the Pickering Balance Test. And here, Ms. Blick, actually, has the burden to show that her speech outweighs the district's interest in the efficient operations of the district. And that's the Brandenburg case. And are you sure that it's her burden? I just, the Kennedy, recent Kennedy case from the Supreme Court, kind of suggests that maybe the burden goes the other way? Well, even if it did go the other way, and I think that the precedent is in our favor, actually, on this issue. Even if it did go the other way, the district has shown and established, first of all, it's a question of law for the court to decide. Second of all, what the district said is that, you know, first of all, we have an investigation going on. We want to maintain the integrity of that investigation. Ms. Blick admits there is absolutely nothing wrong with the district wanting to do that. She admits that at her deposition. But why isn't it overbroad? I completely understand not talking to potential witnesses to influence their testimony. That makes sense. But why, is there any type of tailoring requirement in Pickering balancing? By which I mean, you could have had a narrower speech prohibition that would have said, don't talk to anybody involved in the investigation, rather than don't speak about it at all, even at board meetings or in the media. Well, first of all, it didn't talk about at board meetings or the media. The limitation in the April 26th communication is specific to teachers, parents, and students. Why? Because they don't want disruption at the school. And they talked about that. Mike Madison, her union rep, even told her, listen, if people are talking about this, they may not be knowing the correct information or the correct allegations that are out there. They could be gossiping. It could harm the operations of the school or disrupt it. Also talked about the important relationships at the district, the relationships of trust, and how it could impact the relationship of trust if she came back to the district, if she's pressuring folks about her view on the issue. It could undermine the public's trust of Ms. Giles and Ms. Davis, who are charged with the school. And Judge Murphy, you said in your concurrence in the Bennett case, that even if this court were to find it's a close call on whose interests are greater, the deference goes to the employer. So just to clarify, the school district would have had no exception if she had wrote an editorial opinion piece in the newspaper how she was being stonewalled by the school district, or whatever the correct pejorative is, that that would not have violated the speech prohibition, under your view of the facts? Under our view of the facts, if she were to go out there and write an editorial... Suggesting that she is being falsely accused in order to allow for the assistant principal to become principal, or something to that effect. Well, I think the facts show that she did speak with the media about the facts of the case while this was occurring, and she wasn't penalized for it. There were two articles. So the concession is yes, that the prohibition on her speaking about the investigation would not have included speaking to the media. Right. I don't think it would have included speaking to the media necessarily, but that didn't occur in this case, so the facts aren't before us. She could have spoken to the media. She could have shown up at the board meeting and spoken. She could have launched her own campaign for school board running to decry the villains at Lawton Public School. That could have been her platform. All of that would have been fine. The only thing she couldn't do was talk to parents? I think that's also going to rile up folks at the school, right? No, I'm not conceding that she could have been able to write an article to the paper. I don't know exactly what she's going to say, nor does this court, because she's never told us. But she could have run for school board, I suppose. With a public platform of I was railroaded, I'm going to make this better. And giving her side of the facts of this case. So I want to point out that she did bring a due process case, right? Where she says that I was entitled to a name-clearing hearing during the pendency of the investigation. We've got lots of cases, because I believe that my reputation was being harmed because the district said, please respect my privacy on this matter. And there's tons of case law that says that there's no due process violation from a district not allowing you to have a name-clearing hearing during the pendency of the evaluation. But we're just trying to get a handle, I think, on how broad the speech prohibition was. Not whether it's triggering a name-clearing hearing, but how broad is the prohibition on speech? Would she have been allowed to call the media, do these other things? And that's critical to pickering and balancing is why we're asking the questions, it seems to me. The scope of the speech prohibition relates to the employer interest. The employer interest in this case was to keep, to preserve the operational efficiency of the district. If she's going out in the paper, right, and talking about the scope of the investigation before it's been completed, okay, and saying things that are untrue, I think that there would be interest in prohibiting that speech. I think it depends on what's said in the article. I don't think that we can answer that question today, without it actually occurring. I think the question that we have is not, would that have been a harm? Should the ban have included speaking to the media, or could you have defended that ban? I think the question we're asking is, how broad is the ban? Does the ban, did the ban that you put on include speaking to the media, speaking at the school board? Or did it just say, you may not speak, because that's like an indirect way to speak to the parents, or did it just say, you may not speak directly one-on-one to Lawton school parents, Lawton school children, Lawton school staff? It says, while this investigation is pending, please do not engage in discussions with the students, parents, and teachers at Lawton regarding this matter. She admits this matter is the investigation into her misconduct and her potential fraud. Fraud and misconduct. One thing that I'm a little bit confused with is you were asked, could she speak to the media? You never really answered that, except at one point you said she did speak to the media, and then you said she didn't. So, which is it? Well, no, she, her counsel was quoted speaking to the media. She also... During the investigation? During the investigation. She also filed a complaint during the investigation, and no action was taken in that. There are ways that she can address it that the district can't do anything about. So your allegation, I suppose then, is that what she says that she would have said, she actually did say, but just indirectly, either through her lawyer or through, I assume it was probably a verified complaint. There was a complaint, yes, and she's filed affidavits, she's done lots of things, and she has been penalized for it. You didn't take any action by saying that filing the complaint and whatever she said in the complaint somehow violated this letter of April 26th? No, we didn't take any action, retaliatory action against her at all. No. And how long after she filed the complaint was it before she ended up getting taken off of this long-term leave and actually terminated? 21 months. With respect to any allegation that the police report had anything to do with her filing a complaint, all she has there is temporal proximity, and that's simply not enough in this case. This is, again, more like the Sensabaugh case. We've got an affidavit from Liz Margolis that says we've been talking with the police all along, and we've got testimony that says that she knew from the outset criminal charges could be possible, they did a careful investigation, they turned it over to their lawyers to conduct an investigation. I think in the deposition testimony of Ms. Langford, even opposing counsel pointed out that the records from the law firm were from approximately July 12th, the research that was printed, which is before she even filed her complaint. So this was clearly contemplated all along. Also, there's no evidence of causation that they were going to do it. It was misappropriation of public funds and supported. And there's also no allegation that it was a false police report. They put in the police report, this is what was told to us, we don't know, it's unclear whether or not there was some sort of relationship, and also included the denial from Ms. Blick and from Mr. Johnson. Okay, I have one, I think, final question, which is, I just want to be clear, but none of the defendants here asserted qualified immunity at any point? No, it was raised before Judge Drain, and we point to the fact that specifically Judge Dock and Davis said that this was a close call, whether or not it would have been speech touching on a matter of public concern, and we said that the Murky Waters cases where even the district court judge at the motion to dismiss stage said it was a close call, so how could they have established, how could they have violated a clearly established right? I mean, I could be wrong about this, but don't you have to raise qualified immunity as an affirmative defense, that you have to raise? So when you say I raised it before Judge Drain on summary judgment, is that early enough? I mean, are you asserting QI here? Have you abandoned that? Because this case looks very different if it's a QI case than if it's not. And it's also as part of affirmative defenses, absolutely. So they are set out in your affirmative defenses? Yes. And you maintain that this is still a qualified immunity case? Did you argue that the answer to Pickering balancing is that the law is not clearly established, or did you just say the balancing comes out in our favor? Because those are really different arguments. Well, you don't even get to the Pickering balance test if she's not speaking on a matter of public opinion. Yeah, but what if we disagree with you about that? We're trying to figure out whether you actually affirmatively raised and pursued qualified immunity, because there's no ruling on that, which is curious if you were asked, your motion for summary judgment based on qualified immunity, just logically speaking, the judge would normally say, I'm not going to get to that because of X. Well, I think that there is a ruling about it, but not in a roundabout way. Because Judge Stopp and Stavis says that... Very specific question. Did you seek summary judgment based upon qualified immunity? We said that there was no clearly established right, yes. Where? There's no violation of a clearly established right. Where? We said in the initial briefing that there was no constitutional right that was violated. That's problem one. And then we also added in the reply that it was not clearly established. But you did not cross appeal here on the failure of the judge to accord your client's qualified immunity, right? Right, but there is no reason. We don't waive anything. Appellees don't waive anything. In the Leary case, the court is allowed to look at their record as a whole and decide on any basis that it wishes to for the appellee. That's just an odd litigating strategy, I've got to say. But if your argument is that there's no clearly established law on a Pickering balancing test, which is a multi-factor test, it just seems a little odd that you didn't raise... I mean, I didn't see it in the briefs. It was on the briefing before. But not on the briefing here. So you did not say, Judge Drain got it wrong on the Pickering balancing. Or I'm sorry, Judge Drain got it right on the Pickering balancing. But even if he hadn't gotten it right on the Pickering balancing, it's not clearly established. That's not in the briefing before this court. What is in the briefing before the court is the fact that he pointed to Judge Dawkins-Davis's decision. Judge Dawkins-Davison's decision said it was a close call on the protected speech issue. We don't think it's protected. Here's the reason. She wasn't speaking on a matter of public concern. So even if it wasn't a close call, even if Dawkins-Davis said it was a close call, murky waters, and this court were to disagree, we don't think it's protected. And here's why. Because if she were speaking about it, she'd be speaking about her own personal grievances. Okay. Any more questions? All right. Thank you. And we will hear rebuttal. Thank you very much. So you'll now notice that the 7 and 8 that we were arguing about before is just completely out the window because we've gotten... But you can get your full rebuttal. I'm sitting here ranking what to try to quickly cover with you. And I apologize if I miss anything because I want to hear any questions you have. I've done a lot of 1983 cases and come up before this court. There was no argument about qualified immunity. We were absolutely surprised. I haven't seen that before. It wasn't in the briefing on summary judgment or the dismissal. And I think what the argument is is somehow we should have figured and been on notice because there's not a constitutional right. This court, I think, is fully aware. What the elements are will need to be asserted. It wasn't in discovery. They never raised it. And it wasn't preserved for appeal. So I'd certainly invite anybody to check the briefs. I don't think I saw it anywhere. And I discussed this with my associates strongly before we came. We did not believe that that would be an issue. A few things. On the discrimination, I agree 100% with you that there are multiple ways of showing discrimination. And it is not limited to some sort of comparison. You can show discrimination in various different ways. It was dismissed, EPC, Larson, State Court, on C-8. I mean, it never went in pleadings, motion for dismiss. It never went beyond that. There was no analysis of the McDonnell-Douglas standard. And there are multiple ways that you can show discrimination which were not looked into in this case, which I do believe are a jury issue. The issue of the two-year suspension, I really want to bring this to the court's attention. We looked at every case five days, a week, Farhat, which was a beef case. He had a personal beef. They said passing references to something, it was just a beef, there wasn't a public interest. It was a short period of administrative leave. This is the policy of the Ann Arbor School District that if you pay somebody, then they can take as long as they want. And there were some things said to you about what happened here in this case and what was actually said. The attorney talk is attorney talk. You heard that the reason that they kept her for two years had something to do with the police investigation. There's no evidence that the police did anything. She was charged. That's not before the court. There was no letter, or we're dropping the charges, and now you can move into termination. And in fact, there isn't a link between a criminal investigation and a policy at a school board on administrative leave. The file showed they hired attorneys that completed the investigation right before they went to the police about it. There's no evidence that there was any other investigation. And did you at that point do anything to say, okay, I've been under this injunction or gag rule not to speak, but it seems that the investigation has ended. They turned it over to the police. So can you please lift the record? I'm sorry. I just want to make sure I understand. I understand your argument to be they completed their, the Ann Arbor Public Schools completed its investigation and turned things over to the police. At that moment, the AAPS's investigatory reason for gagging your client, we'll call it a gag, ended. But you never went in and said, like, could you please lift the gag at that point? I don't believe it was our burden. She was desperately trying to be in communication. But I don't think the law says... I don't know. I just feel like a lot of times these cases, the way these pickering cases work or these speech cases work is you're seeking injunctive relief. Like, somebody imposes an order, a gag order, and you go in and try to get that lifted. Well, I don't know if the law says that's required, and I don't want to, you know... But in this case, she asked for a name-clearing hearing. She was told she was going to get it, and then it never happened. And their reason for turning around was that there was an investigation going on. I want to touch on your point. They don't take the file and turn it over. I mean, for the court here, you get the file from the trial court. There is no hard procedure about turning anything over to the police. They had this internal report, which we had a hard time even getting. It wasn't given to the police. The attorney thing wasn't given to the police. They picked out some stuff and went to the police and reported. That is not their policy that stated that we will do an administrative leave investigation and we'll do it for a certain period of time, do our own investigation, come to a conclusion, and then just report you to the police and not do anything for two years. Please, we cited it in the brief. Take a look at the case law out there on how long administrative leaves normally happen. And the matter of payment, eventually they did take money away from her, but it's not the only factor. It's not the only factor. She sat for two years at home in an office doing absolutely nothing. And that clearly raises an issue that should be submitted to a jury about an overly broad restraint. The statements to her, both orally, which are in the affidavits about no communication, the letter telling her not to communicate, she is a parent that has three kids. I mean, clearly there should be communication which is granted to her as a parent. There is no indication they ever restricted this broad gag order on her. And I think if you take all the actions together, bringing a woman in, telling her she's had sex with her janitor, putting it to a file, which I do want to address this, this idea that they were going to release something was false. Even if he FOIA-ed it, it wasn't going to come out. They weren't going to turn over the investigative file. And by the way, there was no evidence that they had that she had sex with Willie Johnson. They say that somebody heard a rumor that she allegedly had some kind of relation to Willie Johnson. There was no evidence found that this person, Willie Johnson, denied it. Nobody said he was having sex. To go to the police when you have looked at this and you have nothing, nothing, and you tell the police that, and you know the media is all over this case. Everyone's talking about what happened with this guy. He is charged with stealing money. And everyone wants to know, was there some sex? Was there something? They wrote a letter that she didn't agree. They're going to show it to her. It's the whole community, parents and everybody. She asked my client to respect her privacy while MLive is talking about what's going on here. That is false. She could have, I mean, according to the Ann Arbor Public Schools, she could have gone to MLive and said, I want to tell my side of the story. I believe the restriction was so broad not to communicate to anybody that she was inhibited from going to MLive. Where does it say not to communicate with anyone? It's pretty specific. Any students, parents or staff regarding this matter? It talks about the teachers and the staff that she can't communicate with. There was also a meeting with the teachers and staff in which it was told not to communicate with her. And she was denied the opportunity as a parent to have the interaction that she would normally have. We've asked you the same question that we asked the school board's counsel, and that is, does this apply to contacting the media or doesn't it? And if you say it does, what part of this directive or gag order do you read to say she can't talk to the media? There were a number of acts taken to inhibit her ability to disseminate this information. I do think, taken together, the letter along with the statements to her... Does the letter say you can't talk to the media? The letter says to these people... This is a yes or no. Well, I completely agree with you that the letter says exactly what it says. It doesn't use the word media. I'm not in any way... So if it isn't in the letter, then what embodied this prohibition that you say was overly broad because, among other things, it included the media? They take her into a meeting. They accuse her. They say they have evidence, which they don't have, of sex. She's crying. And they give her the names of these people to call. There was then a follow-up text that day by Lyndon to Swift, the superintendent, says, I heard the messages out. The parents aren't going. She was clearly happy about that and had communicated to my client, you should not go to that meeting tomorrow. And these... Where do we find that in the record, you should not go to the meeting tomorrow? Well, I'm taking the issue that if you go to... I take that as an inhibition on going to the meeting. I do. When you're told, I have this evidence about your sexual conduct, and you're told, if you go to that meeting, if you go to that meeting, then it's going to be FOIA-ed and it's going to come out that you have the sex. They knew full well that she was planning to, and they knew full well that these parents were going there to address the issue that everybody was talking about. At least it's overly broad. At least it's overly broad and could have been tailored in a way that she would have some interaction with her kids. Why not? I mean, it seems like you wouldn't do this the day before the meeting for any purpose other than to inhibit her. I mean, there's just no other reason. And I've cited a case that... Could you tell me very succinctly what restriction did they impose upon her in connection with her kids that wasn't the same restriction that would apply to every parent? I mean, just a regular parent can't show up at school and say, I want to see my kids or I want to talk to them in the hall or something like that. She only was able to do that while she was employed because she was a principal and she was actually there in the school. She was told, you can't be on the premises, you cannot go to the school building, and that was in effect for two... You're directed not to enter into district buildings or property with the exception of matters that involve your children. I understand the letter, but she was clearly told, and the affidavits are in the record, and she clearly testified she was not allowed on the school property. They talked about... The answer is we find this in the affidavits. It's not in the affidavits. Absolutely. This point that I'm making... That's all I wanted to know. I just want to reference that there are quite a few affidavits and statements by her. I clearly need to go to the school to give my allergy medication to my son. For that to go on for two years, two years, to have that restriction on a parent who has kids there during the two years, I would think is overly broad. I want to mention that the Pickering Standard does in fact place the burden on the defendant to establish these things. And when the interest is as great as this one is, I think there's clearly an issue of fact as to whether there's some outweighing of the policy. The policy could have been tailored. It could have been tailored. Any questions? Thank you for letting me know. I hope you have a wonderful day. Thank you. We appreciated the arguments from both sides. And the case is submitted.